# EXHIBIT A

## AFFIDAVIT OF SHAUN T. SANTOS

I  Shaun T. Santos, being duly sworn, depose and state as follows:

1.      I am a Sergeant with the Lowell, Massachusetts Police Department, and I am currently assigned as a Task Force Agent with the Drug Enforcement Administration ("DEA").  I have been employed as a Police Officer since January 1990.  I have been a narcotics detective since approximately 1995, and I have been assigned full-time to the DEA in various capacities for over ten years.  As a Task Force Agent of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I am currently assigned to the DEA's Financial Investigations Team ("FIT"), a unit dedicated to conducting anti-money laundering operations and asset forfeiture investigations.

2.      During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.  I have also received training regarding the identification and tracing of assets derived from the proceeds of illicit activities, including but not limited to drug trafficking.

3.      In addition to my training, I have had extensive experience in investigating narcotics traffickers.  Since joining the DEA, I have participated in numerous narcotics investigations as a case agent and in a subsidiary role.  I have debriefed more than 100 defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.  I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using

1

confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications.  During my law enforcement career, I have also participated in the preparation and/or execution of numerous search warrants.

4.      Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  I am also familiar with drug traffickers' use of corporate entities, off-shore shelf bank accounts, and nominee names as a method of frustrating the identification and tracing of assets derived from drug trafficking and money laundering enterprises.

5.      This affidavit is submitted in support of a complaint for forfeiture *in rem* against the following assets:

a.      real property registered in the cadastral municipality of Krnica, land record street number 1764, cadastral parcel number 1420/2 – arable land with an area of 851 m$^2$, in the land records of the Municipal Court in Pula, Croatia ("Cadastral Plot 1");

b.      real property registered in the cadastral municipality of  Oprić, land record street number 2543, cadastral parcel number 1210 – with a total area of 2,310 m$^2$, in the land records of the Municipal Court in Opatija, Croatia ("Cadastral Plot 2");

c.      real property registered in the cadastral municipality of Oprić, land record street number 1660, cadastral parcel number 1215/14 – with a total area of 922 m$^2$, in the land records of the Municipal Court in Opatija, Croatia ("Cadastral Plot 3");

d.      real property registered in the cadastral municipality of Oprić, land record street number 1661, cadastral plot number 1215/15 – with a total area of 1,642 m$^2$, and in the land records of the Municipal Court in Opatija, Croatia ("Cadastral Plot 4");

(collectively, the "Croatian Real Properties"), and

e.      one 52-foot Fairline Targa motoring yacht, bearing hull number GB-FLN10444A404 (the "Yacht").

6.      The information contained in this Affidavit is based upon personal knowledge and/or information provided to me by other federal, state, and foreign law enforcement agents

participating in this investigation.  I also have reviewed documentary evidence, including

documents provided by foreign law enforcement representatives pursuant to official requests to

their respective countries, including but not limited to Italy, Austria, Slovenia, the United

Kingdom, Iceland, France, Croatia, and Germany.

7.     This affidavit does not contain all the information I possess regarding this

investigation, but sets forth the following information as probable cause to believe that the

Croatian Real Properties and the Yacht are subject to forfeiture to the United States pursuant to

21 U.S.C. § 881(a)(6) because they are moneys, negotiable instruments, securities, or other

things of value furnished or intended to be furnished by any person in exchange for a

controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys,

negotiable instruments, and securities used or intended to be used to facilitate violations of 21

U.S.C. §§ 846 and/or 963.  This affidavit also sets forth information to establish probable cause

to believe that the Croatian Real Properties and the Yacht are subject to forfeiture pursuant to

18 U.S.C. § 981(a)(1)(A) because they constitute properties involved in a money laundering

transaction, including a money laundering conspiracy, in violation of 18 U.S.C. §§ 1956 and/or

1957, or properties traceable to such property.

## BACKGROUND OF INVESTIGATION

8.     Through various DEA investigations, law enforcement discovered that individuals

and organizations use the internet both to distribute anabolic steroid products and to launder the

proceeds of those sales globally.  Intelligence to date indicates that a number of these anabolic

steroid trafficking organizations receive the raw anabolic steroid product from the Peoples'

Republic of China ("China"), and that various steroid manufacturing plants are located within

Eastern Europe and India.  The manufactured steroid products are then shipped in large

3

quantities to third party "remailers" who receive instructions over the internet as to where and to whom they should send the anabolic steroid products.  This investigation has uncovered a large number of United States-based customers who have received anabolic steroid products from such third party remailers.  Under United States law, anabolic steroids are a controlled substance under 21 U.S.C. § 812(c), and as such the importation, manufacture, distribution, and possession are regulated by the United States government.[1]

9.     In approximately 2006, the DEA in Boston began investigating the anabolic steroid trafficking and money laundering activities of Mihael Karner ("Mihael Karner"), Edwin Richard Crawley ("Crawley"), and numerous others.  During the course of the investigation, the DEA learned that the Austrian Landeskriminalant (the "Austrian LKA") and Italian Carabinieri law enforcement agencies each had conducted investigations into the anabolic steroid distribution activities of Mihael Karner, Alenka Karner ("Alenka Karner," Mihael Karner's spouse), and Crawley, as well as the laundering of their steroid sales proceeds through the banking systems of several countries, including Austria.  The Austrian LKA identified financial and drug-trafficking links between Mihael Karner and Crawley and off-shore bank accounts into which the proceeds of their illegal drug trafficking activities were deposited.

10.     On September 27, 2007, Crawley was indicted in the Western District of Washington and charged with Conspiracy to Distribute Anabolic Steroids, Conspiracy to Import Anabolic Steroids, and Money Laundering.  On March 18, 2011, Crawley pled guilty to Conspiracy to Distribute Anabolic Steroids and was sentenced to time served.[2]  *See United States v. Crawley*, Case No. 07-cr-332, W.D. Wash., Docket Nos. 56, 63.

---

[1] Other countries participating in this investigation, such as Austria, Slovenia, England and Italy, also regulate anabolic steroids.
[2] Crawley died in July 2011.

11.     As a result of these investigations, investigators determined that, between at least May 2000 through April 2008, the Mihael Karner steroid trafficking organization used and maintained a large network of internet websites to advertise, promote, sell, and distribute anabolic steroid products to customers worldwide while receiving payment for the anabolic steroid products in the form of Western Union transfers (*i.e.* money transfers), bank-to-bank wire transfers, and credit card payments.  Attached as Exhibit 1 is a chart depicting the flow of anabolic steroid sale proceeds from websites controlled by the Karner organization to various accounts and, eventually, to the defendant Croatian Real Properties and the Yacht.  The steroid distribution activities of Mihael Karner, Alenka Karner and Matevz Karner, another co-conspirator and believed to be Mihael Karner's sibling (collectively, the "Karners"), were expansive during this time period.  For example, records from just one United States-based domain registration company, GoDaddy.com, showed that the Karners maintained the following websites with that company:

| | |
|---|---|
| ANABOLIC-STEROIDS.COM | ROIDS4SALE.COM |
| ANABOLIC-STEROIDS.NAME | ROIDS4SALE.NET |
| ANABOLIC-STEROIDS.NET | EUROSTEROIDS.COM |
| ANABOLICTHERAPY.COM | EUROSTEROIDS.ORG |
| MUSCLE-MEDS.COM | STEROIDSLAND.COM |
| PHARMABOLIC.COM | UNDERGROUND-PHARMACY.COM |
| PHARMABOLIC.ORG | |

12.     Investigators also discovered that the Mihael Karner organization used "remailers" to fulfill anabolic steroid orders placed by customers through websites.  "Remailers" were individuals living in countries other than Slovenia, where the Karners primarily reside, who received bulk shipments of steroids from the Karners, repackaged them, and mailed out packages to fulfill individual customers' orders from the Karners' websites.  In this manner, the Karners

disguised the true origin of the drugs and made it appear to United States Customs as if the

shipments were from countries such as Italy or the United Kingdom.

13.     Records seized from "remailers" working with the Karners demonstrate the scope

of the enterprise.  For example, evidence seized in 2003 from an Italian remailer yielded lists of

thousands of United States-based customers, whose steroid orders this remailer filled.  Italian

police also seized about 400,000 individual steroid units from the remailer's home.  That same

year, British police seized similar evidence from a remailer located in the United Kingdom.

**Western Union**

14.     Western Union records revealed a large number of funds (in United States dollars)

sent to a "Mihael Karner" and an "Alenka Hribar."  According to Slovenian law enforcement

officials, Alenka Hribar, *a.k.a.* Alenka Karner, is Karner's spouse.  Between approximately 2002

through 2004, about 200 Western Union entries listed a "Mihael Karner" as the payee name (*i.e.*,

the individual receiving the funds), or identified the payee with names that were slight variations

of the name "Mihael Karner," such as "Mihael Tarner," "Mihael Karnner," and "Michael

Karner."  During the same time period, approximately 30 Western Union entries listed "Alenka

Hribar" as the payee name.  In an interview before the Provincial Court in Klagenfurt, Republic

of Austria[3], Mihael Karner stated that according to Western Union policy, each name used to

receive funds had a monetary cap limit, which necessitated changing one or two letters in the

recipient names to allow for the continued collection of funds via Western Union.  In that same

interview, Mihael Karner also admitted to using nominee names to collect payments for internet

steroid sales.  As explained further in ¶¶ 19 – 21, 27 – 31 below, the Mihael Karner organization

used nominees' names to open bank accounts that, in turn, collected the proceeds of online

---

[3] This interview, detailed further below in ¶ 57, occurred on January 11, 2012 during proceedings
regarding whether Mihael and Alenka Karner should be extradited to the United States.

anabolic steroid sales for the Karner organization.

15.     Subsequent interviews of several United States-based anabolic steroids customers revealed that, between approximately 2002 through 2004, these individuals used various internet websites to order anabolic steroid products in return for Western Union payments to "Mihael Karner" and "Alenka Hribar." These United States customers stated that the various websites advertising anabolic steroid products offered several payment options, including Western Union, bank-to-bank wire transfer, and credit card. Upon choosing the Western Union option, the customers were forwarded a name and usually a country location to be used as the recipient of the Western Union transfer, *i.e.*, Mihael Karner of Austria, or Alenka Hribar of Austria.

16.     Examination of records obtained from Western Union further revealed that a large number of Western Union transfers to other payee names such as "Marjetka Hribarslivnick," "Marjan Hribar," and "Goran Hribar." Intelligence derived from Austrian, Slovenian, and other foreign law enforcement officials indicates that Marjetka Hribarslivnick and Marjan Hribar are Alenka Karner's parents, and Goran Hribar is Alenka Karner's sibling.

**Bank-to-Bank Wire Transfers**

17.     As part of the investigation, law enforcement accessed www.pharmabolic.com, one of the websites listed in ¶ 11 above that the Karner organization controlled, which was in the business of selling anabolic steroids. Undercover personnel contacted www.pharmabolic.com through "doc" at doc@pharmabolic.com regarding the internet purchase of, and payment for, anabolic steroid products. Undercover DEA FIT investigators conducted three separate purchases of anabolic steroid products from www.pharmabolic.com, and those items were then mailed to the United States.

18.     On or about January 18, 2007, and for the first undercover purchase of anabolic

steroid products from www.pharmabolic.com, doc@pharmabolic.com instructed undercover personnel to send payment via a Western Union money transfer to Jenya Petrova in the amount of $1,569.40 to Sliven, Bulgaria.  In an interview before the Provincial Court in Klagenfurt, Republic of Austria, referenced in ¶ 14 above and detailed further below in ¶ 57, Mihael Karner stated that he was the only person who used the doc@pharmabolic.com email address.

19.     The second and third undercover purchases of anabolic steroid products from www.pharmabolic.com were conducted in May and July 2007.  For these second and third purchases, "doc" at doc@pharmabolic.com directed undercover DEA personnel to use a bank-to-bank wire transfer to Raiffeisen Bank account number XX1109 in Sofia, Bulgaria, held in the name of Ana Topolovec (the "Ana Topolovec Account").  Slovenian authorities determined that Ana Topolovec and Jozef Topolovec[4] are an elderly couple residing in Slovenia.  Slovenian authorities also believe that the Topolovecs were mere nominees whose names were used to open Bulgarian bank accounts that, in turn, collected the proceeds of online anabolic steroid sales for the Karner organization.

20.     On or about May 19, 2007, undercover law enforcement sent a bank-to-bank wire transfer in the amount of $2,733.15 to the Ana Topolovec Account with the notation "yacht charter."  "Doc" at doc@pharmabolic.com had directed undercover personnel to include the notation "yacht charter" on the bank-to-bank wire transfer, "cause my bank does not like that I sell steroids."  Investigators discovered that Mihael Karner is the authorized skipper of the Yacht, a 52-foot Fairline Targa motoring yacht, bearing hull number GB-FLN10444A404.  The Yacht is registered to Kalliope Limited, a Gibraltar corporation.  According to Gibraltar

---

[4] As further detailed in ¶¶ 27-29 below, Jozef Topolovec's name is associated with a bank account that receives payment for anabolic steroid orders placed through www.anabolicsteroids.org and www.sustanon250.org.

corporate documents, Mihael Karner is the sole shareholder of Kalliope Limited.

21.     On or about July 18, 2007, "doc" at doc@pharmabolic.com again directed undercover personnel to forward approximately $2,315 to the Ana Topolovec Account to pay for anabolic steroid products.

22.     A query in late 2007/early 2008 of "Whois," a publicly accessible database, revealed that www.pharmabolic.com is registered via Go Daddy.com and Domains by Proxy, Inc., a private internet domain registration company.  The use of a private domain registration for a particular website affords the proprietor of the website an additional layer of anonymity.

23.     Domains by Proxy, Inc. records revealed that www.pharmabolic.com is assigned shopper identification number[5] 10554192, and that approximately 25 other domain registrations are assigned the same shopper identification number.  Included among the other domain registration sites assigned shopper identification number 10554192 are:

- ANABOLIC-STEROIDS.COM
- ANABOLIC-STEROIDS.NET
- ANABOLICINFO.COM
- MUSCLE-MEDICATIONS.COM
- MUSCLE-MEDS.COM
- ROID4SALE.COM
- STEROIDSLAND.COM

As part of this investigation, in December 2007, undercover FIT investigators also accessed www.roid4sale.com and used an undercover credit card to purchase anabolic steroid products, which law enforcement received.  The majority of the approximately 26 total domain registrations described above, assigned shopper identification number 10554192, used the same administrative contact and billing contact of:

Name:        Bamex Ltd.
Address:     PostFach 52

---

[5] A shopper identification number is similar to a customer identification number.

City:          Klagenfort
Postal Code:   9023
Country:       Austria.

24.     Based on intelligence from Italian, French, and Austrian law enforcement

authorities, investigators have determined that Bamex Ltd. is a Gibraltar corporation held in the

names of Matevz Karner and Tanya Karner, Matevz Karner's wife.

25.     According to information from Austrian LKA officials, PostFach 52 is a post

office box in Klagenfort, Austria that was assigned to Mihael Karner and Alenka Hribar (*a.k.a.*

Alenka Karner) from approximately 2000 through approximately 2008.  An interview of

Austrian postal personnel revealed that Mihael Karner, Alenka Karner, and a third individual

identified as Mihael Karner's brother or brother-in-law accessed PostFach 52, in Klagenfort,

Austria on several occasions from approximately 2000 through 2003 to retrieve various mail

items.  Austrian LKA officials indicated that upon closing PostFach 52, ostensibly for non-use, a

large number of parcels (many found to contain anabolic steroid products), and envelopes (many

containing currency) were discovered.  Austrian officials indicated that the sums of currency

retrieved from PostFach 52, Klagenfort, Austria were subsequently returned to legal counsel

representing Mihael Karner.  Documents received from the Austrian authorities regarding the

parcels and envelopes have not been translated, and I have no further information about them at

this time.

26.     On September 25, 2006, a VISA credit card in Mihael Karner's name paid to

register www.pharmabolic.com with Domains by Proxy, Inc. and Go Daddy.com, and on

March 25, 2007, subsequent payment for these same domains was made with a VISA credit card

in Matevz Karner's name.  Also on September 25, 2006, the VISA card in Mihael Karner's name

was used to pay for registering the following websites with Go Daddy.com and Domains by

Proxy, Inc.:

- ANABOLIC-STEROIDS.COM
- ROID4SALE.COM
- UNDERGROUND-PHARMACY.COM
- EUROSTEROIDS.COM

27.     In addition to the purchases of anabolic steroid products from

www.pharmabolic.com, described above in ¶¶ 18 and 19, investigators used undercover email

accounts to access www.anabolicsteroids.org, another website that law enforcement believed

Mihael Karner and his organization controlled, to purchase anabolic steroid products.  The

website www.anabolicsteroids.org instructed the undercover investigators to pay via a bank-to-

bank wire transfer to Piraeus Bank account number XXXXXX9793, in Sofia, Bulgaria, held in

the name of Jozef Topolovec (the "Jozef Topolovec Account").  On or about September 28,

2007, investigators conducted a bank-to-bank wire transfer of about $1,228.70 to pay for the

anabolic steroid products ordered via www.anabolicsteroids.org.  Subsequent to the above bank-

to-bank wire transfer, undercover DEA FIT investigators received the anabolic steroid products

in the United States.

28.     Investigators similarly accessed www.sustanon250.org to obtain anabolic steroid

products via the internet.  At that time, the website www.sustanon250.org boasted the following:

"1,116,257 requests since Wednesday 05 January, 2005."  Investigators initially attempted to

make payment via an undercover credit card but were unable to complete the transaction.

Investigators were sent an email from www.sustanon250.org, which stated the following:

> Your order contains Anabolic Steroids.  Due to VISA regulations we cannot process
> credit card payments for Anabolic Steroids.  We suggest you use Western Union,
> MoneyGram, or Bank to Bank payment for these.  We do accept VISA for all other
> products.

29.     Upon opting for the bank-to-bank wire transfer payment option, investigators

11

were directed to forward payment to the Jozef Topolovec Account.  On or about January 18,

2008, investigators conducted a bank-to-bank wire transfer in the amount of approximately

$447.18 to the Jozef Topolovec Account.  After transmitting the above wire transfer, undercover

DEA FIT investigators received the anabolic steroid products in the United States.

30.     Records from the Federal Reserve Wire Network ("FedWire"[6]) revealed several

other bank-to-bank wire transfers into the same Bulgarian bank accounts into which "doc"

directed undercover agents to wire payments for anabolic steroid products.  For example, a

review of FedWire data from February 8, 2007 through October 8, 2008 regarding the Ana

Topolovec Account revealed 24 individual deposits totaling approximately $29,915.12.  Of the

24 individual transactions, ten referenced "Yacht Charter."  As set forth above, "Yacht Charter"

was the same designation that "doc" at doc@pharmabolic.com directed undercover agents to use,

presumably to avoid scrutiny of the illicit anabolic steroid transaction.  Two of these 24

transactions include those conducted by DEA undercover personnel and described above in ¶ 19.

31.     A review of FedWire data for the Jozef Topolovec Account from April 20, 2007

through September 4, 2008 reveals approximately 58 deposits totaling approximately

$32,031.74.  Included within those 58 transactions are the two DEA undercover transactions

described above in ¶¶ 27-29.  A majority of the transactions (approximately 52) appear to

originate from United States-based financial institutions.  In addition, a great number of the

transactions refer to an order or ID number, which investigators believe correspond to internet

---

[6] Fedwire is a real-time gross settlement system that the Federal Reserve Banks operate.  United
States-based financial institutions routinely use the FedWire system to send and receive time-
critical payments, including wire transfers.

steroid purchases.[7]

**Credit Cards**

32.     DEA FIT investigators learned from Austrian, Italian, and French law

enforcement authorities that the Mihael Karner steroid trafficking organization also used credit

cards as a payment method for the internet sale of anabolic steroid products.  DEA FIT

investigators learned that Euro-Online, a French company, is an Internet Payment Service

Provider ("IPSP") that acts as an intermediary between merchant vendors and customers who use

credit cards to purchase merchandise over the Internet.  In other words, after customers buy

items online with their credit cards, Euro-Online transfers the proceeds from the customers to the

sale vendors.

33.     Based on an interview with Euro-Online's proprietors, investigators determined

that Euro-Online managed online payments for a company called "Northstar Trading

Corporation," a corporation registered in the Republic of Seychelles to Mihael Karner and Savo

Stjepanovic,[8] and for "Ammersham Commercial Ventures Limited" and "Panacea International

Limited," corporate entities owned by Mihael Karner and Dejan Donko,[9] respectively.  The

Euro-Online records also included copies of Mihael Karner's and Dejan Donko's Slovenian

passports.  While Euro-Online initially believed these three entities distributed beauty products,

Euro-Online's proprietors later became aware that the three entities distributed anabolic steroid

products via the internet.

34.     Based on records obtained from Euro-Online, investigators determined that funds

---

[7] During the internet steroid ordering process, each online order is assigned an order number, which the seller websites request to be provided along with the payment information.  This allows website operators to reconcile payments with the correct order information.

[8] Law enforcement believe Stjepanovic is a co-conspirator/associate of Mihael Karner involved in the internet distribution of anabolic steroids and money laundering of the proceeds.

[9] Law enforcement believe that Donko is a co-conspirator/associate of Mihael Karner involved in the internet distribution of anabolic steroids and money laundering of the proceeds.

from the Euro-Online accounts for the three entities named above were periodically transferred

into the following accounts held at Volksbank Graz-Bruck, 31 Schmiedgasse, Graz, Austria:

a.   Volksbank Graz-Bruck account number XXXXXXXXXXXXXX877131, held in the name of Northstar Trading Corporation ("Northstar Trading Corp.").  As set forth above, this entity is registered to Mihael Karner and Savo Stjepanovic in the Republic of Seychelles;

b.   Volksbank Graz-Bruck account number xxxxxxxxxxxxxx876666, held in the name of Ammersham Commercial Ventures Limited ("Ammersham Commercial Ventures Ltd.").  This entity is registered to Mihael Karner in the Republic of Seychelles; and

c.   Volksbank Graz-Bruck account number xxxxxxxxxxxxxxx876658, held in the name of Panacea International Limited ("Panacea International Ltd.").  This entity is registered to Dejan Donko in the Dominican Republic ("Panacea International Ltd.").

(collectively, the "Volksbank Accounts").  Between April and July 2004 – a four month period –

Euro-Online transferred 500,000 Euros to the Volksbank Accounts.

35.   The gross deposits into the Volksbank Accounts for 2004, 2005 and 2006 totaled

approximately 5,618,900 Euros.  The vast majority of the incoming deposits to the Volksbank

Accounts were from IPSPs, such as Euro-Online.  For example, the sources of deposits into the

Ammersham Commercial Ventures Ltd. account included:

a.   Euro-Online;

b.   Terra Payments Ltd. (now known as Optimal Payment Solutions), a Montreal-based IPSP;

c.   Small Merchant Services, Inc., a payment processing company that boasts "Pharmaceutical, Prescription drugs, or Online pharmacy – No FDA hassles," and specializes in High Risk/High Volume Merchant Account and International/Off-shore accounts;

d.   RxPayments Ltd., a Tel-Aviv, Israel-based Merchant Service Provider for hospitals, physicians, and pharmacies;

e.   Nummatus Ltd., a St. Kitts-based IPSP;

    f.        E Commerce Services UK, an IPSP based in the United Kingdom; and

    g.        Group ISO International LLC, a California-based IPSP specializing in High Risk Merchant Accounts.

36.      The majority of the deposits into the Panacea International Ltd. account likewise came from IPSPs including:

    a.        Euro-Online;

    b.        E Commerce Services UK;

    c.        World Card Services S.A.R.L., a Luxembourg-based IPSP that conducted weekly processing; and

    d.        CNP Worldwide Inc., an IPSP based in Manila, Philippines.

37.      The majority of deposits into the Northstar Trading Corp. account came from Euro-Online.

38.      Based upon the large number of internet domains/websites controlled by the Mihael Karner organization that promote the sale of anabolic steroid products, there is probable cause to believe that the majority of deposits from the IPSPs referenced above into the Volksbank Accounts constituted proceeds from the illicit sale of anabolic steroids.  In 2005 alone, the money transferring through the Volksbank Accounts was millions of Euros.

39.      While the majority of deposits into the Volksbank Accounts came from IPSPs, the majority of the payments out of the Volksbank Accounts went to accounts held in the names of individuals or entities associated with Mihael Karner and his co-conspirators.  For example, payments out of the Panacea International Ltd. account included payments to the following:

    a.        Bamex Ltd.;
    b.        Northstar Trading Corp.;
    c.        Edwin Richard Crawley;
    d.        Sakhorn Samsoon, a close associate of Edwin Richard Crawley;
    e.        Nutrimed Ltd., a Thailand-based corporation registered to Edwin Richard Crawley;

f.      Asia-Balkan Investments Ltd., a Republic of Seychelles-based corporation registered to Edwin Richard Crawley;

g.      Balkan Investments Ltd., a Republic of Seychelles-based corporation registered to Edwin Richard Crawley;

h.      Mihael Karner;

i.      Alenka Karner;

j.      Marjeta Slivnick;

k.      Dejan Donko;

l.      Savo Stjepanovic;

m.      Northstar Mariner Ltd., a Gibraltar company registered to Savo Stjepanovic;

n.      Matevz Kovac, believed to be Matevz Karner; and

o.      Kalliope Ltd., a Gibraltar corporation with the sole shareholder identified as a Mihael Karner of Ljubljana, Slovenia.[10]

40.      Debits from the Panacea International Ltd. account also included payments to Shanghai Pharmaceutical Machinery Corp. Ltd. ("SPM").  An internet query revealed that SPM is a professional pharmaceutical machinery manufacturer whose main products include "tablet press, capsule filling machine, ampoule filling, and sealing machines."  Notably, FIT personnel have purchased various amounts of anabolic steroid products primarily in the form of tablets and ampoules from websites associated with Mihael Karner's organization.

41.      Similarly, payments out of the Northstar Trading Corp. account included payments to the following:

a.      Mihael Karner;

b.      Alenka Hribar;

c.      Marjan Hribar;

d.      Matevz Kovac, believed to be Matevz Karner;

e.      Panacea International Ltd.;

f.      Savo Stjepanovic;

g.      Edwin Richard Crawley;

h.      Nutrimed Ltd.; and

i.      Northstar Mariner Ltd.

42.      Likewise, debits from the Ammersham Commercial Ventures Ltd. account included payments to the following:

---

[10] This is the same company, described in ¶ 20, to which the Yacht is registered.

      a.      Mihael Karner;
      b.      Alenka Karner;
      c.      Matevz Kovac, believed to be Matevz Karner;
      d.      Savo Stjepanovic;
      e.      Edwin Richard Crawley;
      f.      Nutrimed Ltd.;
      g.      Northstar Mariner Ltd.; and
      h.      Bamex Ltd.

43.      In effect, the Mihael Karner organization used credit card payments as one method to collect the proceeds of internet anabolic steroid sales.  The use of corporate shells (*i.e.*, Northstar Trading Corp., Ammersham Commercial Ventures Ltd., Panacea International Ltd.) established and held by Mihael Karner and his associates served to disguise the true beneficiaries of the internet sales of anabolic steroid products.  The Volksbank Accounts, used as "pass through" accounts, also similarly served to disguise the ultimate destination of the illicit proceeds of internet steroid sales.  The use of so-called "pass through" accounts serves as a layering process and is a common technique used by money launderers to both further frustrate law enforcement efforts and to more fully integrate the illicit funds into mainstream commerce.

**Tax Evasion Investigation of Mihael Karner**

44.      In a report dated June 17, 2010, the Tax Administration of the Republic of Slovenia, Ljubljana Tax Directorate summarized its 2004 – 2009 investigation of Mihael Karner for tax evasion.  In that investigation, Slovenian tax authorities determined that Mihael Karner had not reported any income from February 1, 2002 until December 31, 2008.  Moreover, Mihael Karner told Slovenian tax authorities that he was employed in the area of "body care, at Studio Soncek" from February 1, 2002, to September 30, 2005 but had operated at a loss during that time period, and since September 30, 2005, Mihael Karner was supposedly unemployed.  In short, during the period in which Mihael Karner purchased substantial assets (including the

assets described in ¶¶ 45, 46), he told Slovenian investigators that he had no legitimate sources of income.

45.     In a Declaration of Assets that Mihael Karner provided during the Slovenia's Tax Administration Office investigation, Mihael Karner reported to Slovenian tax authorities that he held the following real properties:

a.     Business premises:  apparently based in Slovenia, claimed as a gift and acquired on April 25, 2001, valued at approximately 70,000 Euro;

b.     Weekend home in Austria:  purchased on June 8, 2004, land valued at approximately 185,000 Euro and construction costing approximately 700,000 Euro; and

c.     Buildable land in Austria:  purchased on September 4, 2008, valued at approximately 260,000 Euro. [11]

46.     According to the Declaration of Assets, Mihael Karner also reported the following assets:

a.     one Porsche 911 Turbo, purchased on October 5, 2007, for approximately 145,000 Euro;

b.     cash on deposit at Deutsche Bank, totaling 10,601 Euro, and cash on deposit at NLB Trnovo, a Slovenian bank, totaling 170 Euro;

c.     accounts receivable as of December 5, 2008, of a company called PANYA AG, which is owned by Mihael Karner, totaling 1,013,723 Euro; and

d.     a December 17, 2004, loan associated with a company called NIPL d.o.o. [12] for 150,000 Euro.

---

[11] Investigators discovered a mortgage obligation with Kreditbank Ferlach, in Ferlach Austria, which appears to correspond with the purchase of this real property.

[12] According to information provided to United States authorities by foreign law enforcement at an international coordination meeting held in January 2012, Mihael Karner owns this entity. Moreover, an internet query of NIPL d.o.o. indicates that NIPL d.o.o. is associated with NIPL Trading Estate Ltd., Log in City Road 55, 1000 Ljubljana, Slovenia with a listed email of "mihaelkarner@sis.si."  Additionally, at the time of Mihael Karner's arrest, Austrian authorities seized his laptop computer.  An analysis of the hard drive revealed that Mihael Karner was using the email address mk@nula8.com.   A review of email communications by mk@nula8.com reveal inquiries to "Dear Mr. Karner," and others where contact information is disclosed by

47.     According to Slovenian tax authorities, as of December 6, 2008, Alenka Karner and the Karner children did not declare any assets.  Alenka Karner declared some income that the Slovenian Tax Authority deemed minimal.

48.     Based on the financial information obtained from Mihael Karner himself, his Declaration of Assets, his lack of reported income, Alenka Karner's minimal income, and the average living expenses for Mihael Karner and his household, the Slovenian tax authorities concluded that Alenka Karner's income was insufficient for the Karner living expenses, "much less for the acquisition of the assets held by the taxpayer [Mihael Karner]."  Furthermore, Slovenian tax officials found that the "taxpayer's possessions greatly exceeded his reported income."

49.     The Slovenian Tax Administration requested that Mihael Karner provide documentation regarding his declared assets.  Mihael Karner, in turn, provided Slovenian tax authorities with the following documents as proof of the origin of the funds:

   a.     bank account statements for Northstar Trading Corp. – the corporation that contracted with Euro-Online, described above – showing withdrawn cash totaling 1,980,508 Euro;

   b.     bank account statements for Ammersham Commercial Ventures Ltd. – another entity that contracted with Euro-Online – showing withdrawn cash totaling 127,200 Euro, constituting profit payments to Mihael Karner as the agent/representative of the company;

   c.     paperwork dated December 5, 2005, indicating that the company PANYA AG, a joint stock company established under the laws of Lichtenstein, is the sole founder and member of NIPL d.o.o. (the company noted above, which lists Mihael Karner's email address as the contact);

   d.     paperwork indicating that NIPL d.o.o. had an increase in registered stock of approximately 1,013,723 Euro (the same value of an accounts receivable declared by Mihael Karner in his Declaration of Assets, see ¶ 46 above); and

_____

mk@nula8.com as "Mihael Karner, N.I.P.L. D.O.O., VELINVESTMENT DOO, Vilharjeva 27, Ljubljana, tel. 040 770 077."

e.      a December 5, 2008, agreement regarding the transfer of the business interest in NIPL d.o.o., indicating that the transferor, Mihael Karner, is the sole member of NIPL d.o.o.

50.      After Mihael Karner submitted the above documents, Slovenian tax authorities asked him for more information about North Star Trading Corp., Ammersham Commercial Ventures Ltd., and the cash withdrawn from Austrian financial institutions.  Through his agent (who may have been legal counsel), Mihael Karner explained that he had completely disposed of North Star Trading Corp.'s and Ammersham Commercial Ventures Ltd.'s e-commerce operations and that a business confidentiality agreement bound Mihael Karner from divulging the contents of the agreement.  In short, it appears that Mihael Karner was attempting to hide the fact that he had substantial income, held in the names of corporate shells, from steroid distribution activities.

51.      On July 2, 2009, Mihael Karner told Slovenian tax officials, in conjunction with their tax evasion investigation, that he had not carried out any for-profit activities and that he withdrew cash from Austrian banks to purchase and construct the weekend home described in ¶ 45(b) above.

52.      Mihael Karner also told Slovenian tax officials that he was sole owner and representative of various off-shore companies engaged in e-commerce.  According to Mihael Karner, funds generated from these off-shore companies then were transferred to the Austrian banks by the Swiss company, Easy to Pay.  Mihael Karner stated that Easy to Pay managed the credit card payments for his off-shore companies' e-commerce activities.  (Mihael Karner's admission confirms information that United States investigators received from Euro-Online's owner, who said that Easy to Pay had referred Mihael Karner to them as a customer.)

53.     Based on Mihael Karner's statements, Slovenian tax authorities concluded that

Mihael Karner paid for his assets with cash that he withdrew from Austrian bank accounts.  In

the June 17, 2010 report by the Tax Administration of the Republic of Slovenia, Ljubljana Tax

Directorate, the Slovenian government found that Mihael Karner's behavior "exhibits the legal

signs of the offense of tax evasion punishable under Article 256 of the Penal Code."

54.     After consulting with law enforcement in Italy, Slovenia, Austria, France, and the

United Kingdom, among other foreign counterparts, DEA investigators found no information

indicating that Mihael Karner, Alenka Karner, and Matevz Karner are engaged in any lawful

employment, further confirming Mihael Karner's own admissions (a) to Slovenian authorities,

conceding his lack of legitimate income, and (b) (as explained in more detail in ¶ 57 below) to an

Austrian court, confirming that he sold steroids internationally from at least 2000 through 2008.

I have probable cause to believe, therefore, that any assets that Mihael Karner and his

organization obtained and/or purchased are derived from proceeds of the illegal internet sale of

anabolic steroid products.

**Criminal Case in Massachusetts**

55.     Based, in part, on the information set forth above, a three-count Indictment was

returned in the District of Massachusetts on March 3, 2010, *United States v. Mihael Karner, et*

*al.*, Criminal Case No. 10-10063-DPW.  The Indictment charged Mihael Karner, Matevz Karner,

and Alenka Karner with Conspiracy to Launder Money, in violation of 18 U.S.C. § 1956(h),

Conspiracy to Distribute Anabolic Steroids, in violation of 21 U.S.C. § 846, and Conspiracy to

Import Anabolic Steroids, in violation of 21 U.S.C. § 963, between at least May 2000 to April

2008.  The Indictment also contained forfeiture allegations pursuant to 21 U.S.C. § 853 and 18

U.S.C. § 982.  On October 27, 2010, the United States District Court (Woodlock, D.J.) issued a

Restraining Order against the Yacht and the weekend home mentioned in ¶ 45 above, and more fully described as the real property located at Schwalbenweg 9, A-9546 Bad Kleinkirchheim, Austria (the "Austrian Real Property").[13]  *See United States v. Mihael Karner, et al.*, Criminal Case No. 10-10063-DPW, Docket No. 10.  Moreover, on May 24, 2012, the United States District Court (Woodlock, D.J.) issued a Restraining Order against the Croatian Real Properties. *Id.* at Docket 19.[14]

56.     Based on the Indictment and a formal package seeking extradition of the Karners, on December 27, 2011, Austrian police arrested Mihael and Alenka Karner at the Austrian Real Property.  Matevz Karner, who is aware of the United States' Indictment, is a fugitive and, based on press reports, is in Slovenia.  *See also* ¶ 58 below.

57.     On January 11, 2012, during court proceedings in Austria regarding whether Mihael and Alenka Karner should be extradited, Mihael Karner admitted that he sold steroids over the internet, did so beginning in about 2000, sold them internationally, including to buyers in the United States, and made about 2.5 million Euro in this period.[15]  Specifically, according to a summary of Mihael Karner's testimony from the Provincial Court in Klagenfurt, for the Republic of Austria, Mihael Karner stated,

> It is true that I sold substances through the Internet that are included in the prohibition list in Appendix I of the UNESCO Convention, whereas it is recorded that the interpreter reads out the substances in parts.[16]  I offered this on websites on the Internet; this is

---

[13] On December 21, 2012, the United States filed a civil *in rem* forfeiture complaint against the Austrian Real Property.  *See United States of America v. Schwalbenweg 9, A-9546 Bad Kleinkirchheim, Austria*, Civil Action No. 12-12366-NMG.

[14] The descriptions of the Croatian Real Properties in ¶ 5 above are slightly different than the real property descriptions in the May 24, 2012 Restraining Order because the ¶ 5 descriptions are based on a more recent translation of the Croatian court decision referenced in ¶ 64 below.

[15] Based on this investigation, that figure is far below actual sales.  Moreover, based on communications with individuals associated with the Karners, investigators believe that the Karners did not stop selling steroids in 2008 but continue to do so to date.

[16] So in original.

where it was ordered, and then it was delivered to the United States of America.  I did not personally know any of the buyers in the United States.

. . . .

I cannot say to how many persons in the United States I sold the substances that are set forth in the prohibition list.  I sold them from approximately 2000 to approximately 2007 or 2008.  Regarding the ordered products, advance payments were made, and then delivery was effected.

Regarding the remailer in Italy, who was mentioned in the file, and from whom substances that are included in the prohibition list were seized, I would like to state that he was initially one of my customers who then approached me and suggested obtaining these doping substances in larger quantities and subsequently distributing them further.  This, because shipment from Italy was easier than from Greece, whereas the substances were continually obtained from Greece, since they are cheaper there.   Also, the substances were purchased legally in Greece.

However, the orders continued to be placed through my websites, and I then transmitted a list to the Italian remailer containing the persons to whom deliveries were to be made in order to satisfy the orders.  The Italian remailer distributed a part of the goods ordered from me and sold by me.

In total, i.e. including the substances that are not on the prohibition list, I earned approx. 2.5 million Euro during this time period.  Of course this includes substances that I sold to the United States.

. . . .

When I started the distribution, I did not immediately study 100 laws in the world in terms of the countries into which the anabolic steroids were shipped.  When a law was introduced in Slovenian [sic] in 2008, I ordered an expert opinion from the university in Laibach in order to check whether this was an illegal course of action.  This expert opinion stated that the business, as I had established it, namely the sale through websites into all states, is permissible.

58.     Following the December 27, 2011 arrests of Mihael and Alenka Karner at the

Austrian Real Property, various law enforcement agencies held a coordination meeting at the

Austrian Ministry of Justice in January 2012.  Attendees included investigators from Austria,

Italy, Slovenia, Croatia, and the United States.  Slovenian officials informed the meeting

attendees that shortly after Mihael and Alenka Karner's arrests, they interviewed Matevz Karner

in Slovenia.  During the interview, Matevz Karner admitted that the allegations in the United

States' Indictment were true.[17]

59.     An Austrian lower court found Mihael and Alenka Karner subject to extradition in

January 2012, a ruling that an appellate tribunal upheld.  Mihael and Alenka Karner were scheduled

for extradition on March 30, 2012, but on the day they were to be transferred to the United States

Marshals' custody, the Austrian Constitutional Court granted a last-minute stay.  That court

eventually found that it lacked jurisdiction to review the extradition order, and Mihael and Alenka

Karner's petition for review of the extradition order was dismissed.  The Austrian Constitutional

Court also reviewed Mihael and Alenka Karner's detention pending extradition and, on April 5, 2012,

released them on 1 million Euro bail.  Within days of release, Mihael and Alenka Karner fled Austria,

and Slovenian authorities confirmed that they are now in Slovenia.  The DEA and the International

Criminal Police Organization (*a.k.a.* "Interpol") consider Mihael and Alenka Karner fugitives.

## INVESTIGATION OF THE ASSETS

### The Croatian Real Properties

60.     After the January 2012 coordination meeting at the Austrian Ministry of Justice,

Croatian and Slovenian law enforcement authorities discovered additional corporate entities that

Mihael Karner owns, one of them named Romarius d.o.o.  Publicly available information about

Romarius d.o.o. lists Mihael Karner and Avgustin Karner (Mihael Karner's father) as directors

and describes the entity as a private limited liability company engaged in real estate.

61.     Croatian officials discovered a high number of Western Union transfers to

Romarius d.o.o. from approximately 2002 through 2011 totaling approximately $2,502,800

USD, including the following:

---

[17] Note that countries generally do not extradite their own citizens, so Slovenian police, though
cooperating with the United States investigation, did not arrest Matevz Karner.

| Date | Amount | Source |
|---|---|---|
| November 30, 2006 | $159,987 USD | Kalliope Ltd. |
| February 27, 2007 | 126,000 Euro | from Gelo d.o.o. (described as bookkeeping services for Romarius d.o.o.) |
| February 27, 2007 | $99,987 USD | Kalliope d.o.o. |
| February 19, 2008 | $199,965 USD | Kalliope d.o.o. |

62.     As previously stated in ¶ 20, Kalliope Ltd. is a Gibraltar corporation of which

Mihael Karner is the sole shareholder and the entity to which the Yacht is registered.  During the

investigation, DEA agents determined that Mihael Karner used Kalliope Ltd. as a corporate shell,

along with such companies as North Star Trading and Ammersham Commercial Ventures, to

process steroid payments.  For example, during their investigation of Mihael Karner in 2005,

Austrian police made undercover purchases from Mihael Karner's steroid sites and wired

payments to accounts in Kalliope's name.  In 2007, the DEA made an undercover purchase from

www.roids4sale.com, a site based with a United States domain registration company, which

Mihael Karner and Matevz Karner paid for using their personal credit cards.  According to credit

card records, the payment was processed by "WCS.KALLIOPESALES.com."  "Kalliope-Sales"

appears to be a domain registered to Kalliope Ltd.  The "WCS" prefix appears to denote World

Card Services, a credit card processor based in Luxembourg that is willing to host "internet

pharmacy" sites.  Records from Commerz Bank in Germany, for a WCS account, show funds

outgoing to an account held in the name of Panacea International (a corporate entity owned by

co-conspirator Dejan Donko that contracted with Euro-Online, as summarized above in ¶¶ 33-

34).  Outgoing funds from the Panacea account went to accounts belonging to Mihael and

Alenka Karner, Bamex Ltd. (a Gibraltar corporation described in ¶ 24 above), North Star

Trading, and Kalliope Ltd.  Finally, Kalliope Ltd. was also, at one time, listed as the registrant

for the "roids4sale" site.

63.    Croatian officials discovered that Romarius d.o.o. purchased the Croatian Real Properties in 2006 and 2007, during the time period of the drug and money laundering conspiracy charged against Mihael Karner, Matevz Karner, and Alenka Karner, and in the period during which Mihael Karner admitted that he had no legitimate income.  Specifically, Croatian Ministry of Finance, Tax Administration officials obtained sales contracts showing that Romarius d.o.o. made the following real property purchases:

| Date | Real Property | Purchase Price | Romarius d.o.o. representative |
|---|---|---|---|
| on or about March 24, 2006 | Cadastral Plot 1 | approximately 27,000 Euros | Mihael Karner |
| on or about February 28, 2007 | Cadastral Plot 2 | approximately 125,000 Euros | Avgustin Karner |
| on or about November 17, 2006 | Cadastral Plot 3 | approximately 107,500 Euros | Avgustin Karner |
| on or about November 17, 2006 | Cadastral Plot 4 | approximately 142,500 Euros | Avgustin Karner |

64.    On May 24, 2012, the United States District Court (Woodlock, D.J.) issued a Restraining Order against the Croatian Real Properties, pursuant to the forfeiture allegations of the March 3, 2010 Indictment against the Karners.  *See United States v. Mihael Karner, et al.*, Criminal Case No. 10-10063-DPW, Docket No. 19.  On October 30, 2012, pursuant to an MLAT request from the United States to enforce the May 24, 2012 Restraining Order, a Croatian court issued a restraining order against the Croatian Real Properties.

65.    According to Croatian officials, the Croatian Real Properties may now be held in the name of North Group Holding Corp. ("North Group Holding"), a corporation operating in the Republic of Panama.  DEA agents recently met with the company that incorporated North Group Holding in Panama.  During that meeting, investigators discovered that Mihael Karner was the individual who incorporated North Group Holding in Panama.

26

66.     Moreover, based on North Group Holding's corporate documents, two of North Group Holding's three shareholders are Yahaira de Sedas and David Menotti, who also appear to be the same individuals who are shareholders of Pabas Holding Corporation.  Pabas Holding Corporation, in turn, is another corporate entity associated with the Mihael Karner organization.[18]  Meanwhile, according to Slovenian sources, Mihael Karner currently is seeking potential buyers for the Croatian Real Properties.

67.     Based on the foregoing, I have probable cause to believe that the Croatian Real Properties are subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because they are moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 846 and/or 963; and/or pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute properties involved in a money laundering transaction, including a money laundering conspiracy, in violation of 18 U.S.C. §§ 1956 and/or 1957, or properties traceable to such property.

**The Yacht**

68.     As set forth above in ¶¶ 34, 35, and 42, during 2004, 2005 and 2006, the Mihael Karner organization deposited proceeds of its anabolic steroid sales into, among other accounts, Volksbank Graz-Bruck account number xxxxxxxxxxxxxx876666, held in the name of

---

[18] According to publicly available information, Matevz Karner and Pabas Holding Corporation both were listed as the founders and shareholders of a company called Pale Ltd., which is registered in Slovenia.  On February 23, 2009, Matevz Karner withdrew as a shareholder and Pabas Holding Corporation, in turn, became the sole shareholder of Pale Ltd.  In addition, according to Slovenian authorities, a company called Palea d.o.o. also is affiliated with both Matevz Karner and Pabas Holding Corporation.  Specifically, Palea lists Matevz as a representative and lists Pabas Holding Corporation as founder/partner.

Ammersham Commercial Ventures Ltd. (the "Ammersham Commercial Account"), and thereafter transferred funds from the Ammersham Commercial Account into accounts held in the names of individuals and entities associated with the Mihael Karner organization.  Accordingly, there is probable cause to believe that all funds contained in the Ammersham Commercial Account constituted properties involved in money laundering transactions in violation of 18 U.S.C. § 1956(h), or properties traceable thereto.

69.     Financial records also revealed the following debits and notations from the Ammersham Commercial Account between August 18, 2004 and March 7, 2005**:**

  a.     From Mihael Karner for Traga [sic] 34 from 21.8 to 28.8; 4,800;[19]
  b.     Deposit for Targa Karma; 50,000 euros;
  c.     4th TSF for Karma Targa;[20] 50,000 euros;
  d.     Payment for Fairline Karma 6th TSF; 45,000 euros;
  e.     Targa 52 Karma TSF 7; 39,000 euros;
  f.     Targa Karma Fairline TSF 10; 50,000 euros;
  g.     11th TSF for Karma Targa Fairline;[21] 40,000 euros; and
  h.     Last payment for Targa Karma;[22] GBP 2.600,00.

70.     As mentioned previously, this investigation revealed that Mihael Karner is the authorized skipper of the Yacht, which is owned by Kalliope Limited, a Gibraltar corporation of which Mihael Karner is the sole shareholder.  An internet query via BING, an online search database, describes the Yacht as a "luxury long-range sports cruiser" and, as explained in ¶ 55, the Yacht is currently subject to a criminal Restraining Order issued in *United States v. Mihael Karner, et al.*, Criminal Case No. 10-10063-DPW.

71.     As set forth above, the Karners are charged with running a large-scale anabolic steroid distribution operation between at least May 2000 and April 2008.  And after consulting with foreign

---

[19] This amount appears to be in Euros.
[20] This notation appears to be a reference to a fourth payment.
[21] This notation appears to be a reference to an eleventh payment.
[22] This amount appears to be in Great Britain pounds.

counterparts, including but not limited to Italy, Slovenia, Austria, and the United Kingdom, United

States investigators have found no information showing that Mihael Karner, Alenka Karner, or

Matevz Karner were engaged in any lawful employment during at least 2004, 2005 and 2006.

72.     Based on the foregoing, I have probable cause to believe that the Yacht is subject to

forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it is moneys, negotiable

instruments, securities, or other things of value furnished or intended to be furnished by any person

in exchange for a controlled substance or listed chemical, or proceeds traceable to such an

exchange, or moneys, negotiable instruments, and securities used or intended to be used to facilitate

violations of 21 U.S.C. §§ 846 and/or 963; and/or pursuant to 18 U.S.C. § 981(a)(1)(A) because the

Yacht constitutes property involved in a money laundering transaction, including a money

laundering conspiracy, in violation of 18 U.S.C. §§ 1956 and/or 1957, or property traceable to such

property.

## CONCLUSION

73.     Based on the foregoing, there is probable cause to believe that the Croatian Real

Properties and the Yacht are subject to forfeiture to the United States pursuant to 21 U.S.C.

§ 881(a)(6) because they are moneys, negotiable instruments, securities, or other things of value

furnished or intended to be furnished by any person in exchange for a controlled substance or listed

chemical, or proceeds traceable to such an exchange, or moneys, negotiable instruments, and

securities used or intended to be used to facilitate violations of 21 U.S.C. §§ 846 and/or 963; and/or

pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute properties involved in a money

laundering transaction, including a money laundering conspiracy, in violation of 18 U.S.C. §§ 1956

and/or 1957, or properties traceable to such property.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on March 26, 2013 at Boston, Massachusetts.

Task Force Agent Shaun Santos
United States Drug Enforcement Administration

# EXHIBIT 1 - PROCEEDS FLOW TO CROATION REAL PROPERTIES AND YACHT

